UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF CALUMET CITY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SECRETARY OF HOUSING AND URBAN )<br>DEVELOPMENT, UNKNOWN OWNERS )<br>and NON-RECORD OWNERS, )<br>)<br>Defendants ) | No. 08 C 3861<br><br>Judge St. Eve<br><br>(formerly case no. 08 M6 2629 in the Circuit Court of Cook County, Illinois.) |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

### Introduction

Plaintiff Calumet City filed suit in state court seeking to demolish real property owned by the Department of Housing and Urban Development ("HUD"), as well as for costs and other relief, for alleged violations of city building codes. HUD removed the action to this court, which should dismiss the City's suit with prejudice for failure to state a claim, as the Supremacy Clause of the Constitution bars such actions by local governments against a federal agency such as HUD.

### Facts

HUD owns property (a single-family house) commonly known as 1408 Forest Place, Calumet City, Illinois. Compl., ¶ 2. City building inspectors allegedly inspected the property and found it to be in violation of city building codes. *Id.*, ¶¶ 6, 8. The City's Department of Inspectional Services then recommended that the house be demolished as an unsafe and non-repairable structure. *Id.*, ¶ 8.

In June 2008, the City filed a complaint in the Circuit Court of Cook County against HUD, seeking authorization under state law, 65 ILCS 5/11-31-1(a), to demolish the residence on the Price Avenue property. HUD removed the case to federal district court under 28 U.S.C. § 1442(a).

**Argument**

**The State Demolition Action Against Federal Property Is Barred by the Supremacy Clause of the Constitution.**

The City's complaint seeking demolition of federal property under local and Illinois state law fails to state a claim for relief against a federal agency such as HUD because it is barred by the Supremacy Clause of the Constitution, which provides that the laws of the United States shall be the supreme law of the land. U.S. Const., Art. VI, Cl. 2. State and local law may run afoul of the Supremacy Clause by one of two ways: (1) the law may directly regulate or discriminate against the federal government (and therefore violate the intergovernmental immunity doctrine) or (2) the law may conflict with (and therefore be preempted by) an affirmative command of Congress. *North Dakota v. United States*, 495 U.S. 423, 434 (1990). The City's action violates the Supremacy Clause both ways.

**A.     Intergovernmental Immunity**

The City's action is barred under the doctrine of intergovernmental immunity, which bars local or state governments from regulating the federal government. *North Dakota v. United States*, 495 U.S. at 436; *M'Culloch v. Maryland*, 17 U.S. 316, 436-37 (1819). Federal courts have held that similar efforts by local governments to demolish HUD-owned properties in order to enforce their building codes against HUD were barred under the intergovernmental immunity doctrine of the Supremacy Clause. *United States v. City of St. Paul*, 258 F.3d 750 (8th Cir. 2001), *cert. denied* 535 U.S. 904 (2002); *City of Des Moines v. Secretary of Housing and Urban Development*, 2000 WL

33666936, *2, 3 (S. D. Iowa 2000) (attached); *Commonwealth of Massachusetts v. Hills*, 437 F. Supp. 351 (D. Mass. 1977). This court has also previously enjoined as violating the Supremacy Clause similar local efforts to enforce building codes against HUD and HUD contractors. *City of Country Club Hills v. United States Department of Housing and Urban Development*, 2001WL 1117276, *7 (N. D. Ill. 2001) (attached).

In fact, the situation in this case is virtually identical to that in the *City of Des Moines* case. There (as the City of Calumet City has done in this case) the City of Des Moines sued HUD in state court, seeking to demolish a HUD-owned single-family residence for alleged violations of its local building code. *City of Des Moines*, 2000 WL 33666936, *1. The City's demolition case was similarly removed to federal district court, which found that municipality's demolition action to enforce its building codes was a direct effort to regulate the activities of the government — HUD's program to maintain and sell properties from its single-family home inventory — and therefore violated the Supremacy Clause. *City of Des Moines*, 2000 WL 33666936, * 4. The district court in the *City of Des Moines* court held that HUD was not subject to the City's local building codes by virtue of the doctrine of intergovernmental immunity, and this court should similarly find that HUD is not subject to demolition under Illinois the City's local building codes. *Id.*

**B.    Preemption**

With the passage of the National Housing Act, Congress charged HUD with the goal of providing "a decent home and suitable living environment for every American family." 12 U.S.C. § 1701(t). In order to carry out this mandate, HUD has the authority to sell property in "as-is"

condition, notwithstanding contrary local or state building codes. 12 U.S.C. § 1710(g);[1] 24 C.F.R. §§291.100(c)(2)-(3); 24 C.F.R. § 291.205.

This court has previously held that the National Housing Act and subsequent regulations authorizing HUD to acquire, maintain and sell single family properties preempt local building codes. *City of Country Club Hills v. United States Department of Housing and Urban Development*, 2001WL 1117276, *6 (N. D. Ill. 2001). In particular, this court noted that the National Housing Act, 12 U.S.C. § 1710(g) conferred broad discretionary authority upon the HUD Secretary, including selling its properties in "as-is" condition. *Id.* Those same provisions preempt regulation of the subject premises in this case by Claumet City, not withstanding its allegations that the condition of the property is in violation of local building codes. Furthermore, HUD's efforts to manage and sell the subject property in "as-is" condition, as authorized by the National Housing Act are being stymied by the City's pending demolition action for alleged building code violations. The City's suit is precisely the type of local regulation of federal agencies prohibited by the Supremacy Clause, and for that reason is subject to dismissal.

---

[1] Section 1710(g) provides that: "Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, the Secretary shall have power to deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in his discretion, any properties conveyed to him in exchange for debentures and certificates of claim as provided in this section . . . The Secretary shall, by regulation, carry out a program of sales of such properties and shall develop and implement appropriate credit terms and standards to be used in carrying out the program . . . The Secretary may sell real and personal property acquired by the Secretary pursuant to the provisions of this chapter on such terms and conditions as the Secretary may prescribe."

12 U.S.C. § 1710(g).

**Conclusion**

For the reasons set forth above, plaintiff's complaint should be dismissed, with prejudice.

        Respectfully submitted,

        PATRICK J. FITZGERALD
        United States Attorney

        By: s/ Ernest Y. Ling
           Assistant United States Attorney
           219 South Dearborn Street
           Chicago, Illinois 60604
           (312) 353-5870
           ernest.ling@usdoj.gov

Westlaw.

Not Reported in F.Supp.2d                                                                                                        Page 1
Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa))

City of Des Moines v. Secretary Housing and Urban Development
S.D.Iowa,2000.
Only the Westlaw citation is currently available.
United States District Court, S.D. Iowa.
CITY OF DES MOINES, Iowa, Plaintiff,
v.
SECRETARY OF HOUSING AND URBAN DEVELOPMENT, Defendant.
No. 4:00CV90625.

Sept. 22, 2000.

MEMORANDUM OPINION AND ORDER

PRATT, District J.

I. Background

*1 Plaintiff, City of Des Moines (the "City"), brought this action in the Iowa State District Court for Polk County, regarding the structures at 1256 E. 25th Street, Des Moines, Polk County, Iowa. Defendant, Secretary of the Department of Housing and Urban Development ("HUD"), is the titleholder of record of the buildings at that address. HUD removed this action to federal court pursuant to 28 U.S.C. § 1442(a)(1).

The facts in this case are not disputed. The City alleges that the structures located upon this property are dangerous to the public health and safety, are a nuisance, and violate various sections of the Municipal Housing Code of Des Moines.[FN1] The Notice of Inspection attached to the Petition states that the main structure, detached garage, and shed are in poor repair. The City requested in its Petition that "the Court declare the structures located upon this property a public nuisance and enter an order directing the Defendant ... to immediately vacate and secure the structures, renovate or remove the structures and level the ground upon which they stand."There is no indication that HUD has remedied any of the conditions listed in the Notice of Inspection.

> FN1. The City alleges violations of the following provisions of the Municipal Housing Code of Des Moines: 14-10, 14-12, 14-13, 14-14, 14-16, 14-34, 03.04, 04.01.02, 04.09, 07.10, 07.11.

The action is before the Court on HUD's motion to dismiss. Originally, HUD cited two grounds for this motion. First, HUD argued that the City's claim should be dismissed for want of subject matter jurisdiction on sovereign immunity grounds. SeeFed.R.Civ.P. 12(b)(1). Second, HUD argued that the City's claim should be dismissed for failure to state a claim upon which relief can be granted because the claim was barred under the federal Supremacy Clause. SeeFed.R.Civ.P. 12(b)(6).

On May 4, 2000, the Court issued a memorandum opinion and order on HUD's motion to dismiss. The Court denied HUD's motion to dismiss on sovereign immunity grounds and ordered the parties to supplement their briefs with respect to Supremacy Clause grounds for dismissal. Thus, the only remaining basis for dismissal is HUD's claim that the City has failed to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Both the City and HUD have supplemented their briefs accordingly. The matter is fully submitted.

II. Standard for 12(b)(6) Motion to Dismiss

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d     Page 2
Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa))

In addressing a motion to dismiss under Rule 12(b)(6), this Court "is constrained by a stringent standard .... A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no* set of facts in support of his claim which would entitle him to relief."*Parnes v.. Gateway 2000, Inc.,* 122 F.3d 539, 545-46 (8th Cir.1997) (quoting *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982) (citation omitted) (emphasis added)).

In addition, the complaint must be liberally construed in the light most favorable to the plaintiff and should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. *See Parnes,* 122 F.3d at 546. Finally, when considering a motion to dismiss for failure to state a claim, a court must accept the facts alleged in the complaint as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The Supreme Court has articulated the test as follows:

**\*2** When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

*Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 191 (1984). A motion to dismiss should be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."*Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995).

III. Discussion

The sole issue before the Court is whether the Supremacy Clause bars the City's lawsuit against HUD. The Supremacy Clause provides that the laws of the United States shall be the supreme law of the land. U.S. Const. art. VI, cl. 2. There are two ways for state and local law to run afoul of the Supremacy Clause: (1) the law may directly regulate or discriminate against the government (and therefore violate the intergovernmental immunity doctrine) or (2) the law may conflict with (and therefore be preempted by) an affirmative command of Congress. *North Dakota v. United States,* 495 U.S. 423, 434 (1990). HUD argues that the City's codes run afoul of the Supremacy Clause in both respects. The Court agrees.

A. Intergovernmental Immunity

The proscription that a state or local entity may not directly regulate the federal government or discriminate against the federal government is known as the doctrine of intergovernmental immunity. *See North Dakota,* 495 U.S. at 436. The City's attempt to apply its housing code to property owned by HUD is an attempt to directly regulate the federal government. The City's claim against HUD is therefore barred by the doctrine of intergovernmental immunity.

The doctrine of intergovernmental immunity was first articulated in *M'Culloch v. Maryland,* 17 U.S. 316, 425-437 (1819). In *M'Culloch,* the Court struck down a state tax imposed on a federally chartered bank. *Id.* at 437.In doing so, the Court held that "the states have no power ... to retard, impede, burden, or in any manner

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3
Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa))

control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government."*Id.* at 436.Chief Justice Marshall explained: "If any one proposition could command the universal assent of mankind, we might expect it would be this-that the government of the Union, though limited in its powers, is supreme within it sphere of action."*Id.* at 405.

**\*3** Over the years; the Supreme Court has repeated and refined this proscription. In *Johnson v. Maryland,* 254 U.S. 51 (1920), the Court held that a state could not require a postal driver to obtain a license from that state before driving on its roads. However, the Court in *Johnson,* cautioned that where the Federal Government has not promulgated a law on the subject, it may very well be that subjection to local law would extend to general rules that may incidentally affect the Government's operations, as for instance, an ordinance regulating the mode of turning at the corners of streets. *Id.* at 56.In *Mayo v. United States,* the Court, holding that the application of state inspection fees to government fertilizer violated the Supremacy Clause, noted the following:

Since the United States is a government of delegated powers, none of which may be exercised throughout the Nation by any one state, it is necessary for uniformity that the laws of the United States be dominant over those of any state. Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements. The supremacy clause of the Constitution states this essential principle.Article VI. A corollary to this principle is that the activities of the Federal Government are free from regulation by any state.

319 U.S. 441, 445 (1943). Finally, in *Goodyear Atomic Corp. v. Miller,* the Court stated that "[i]t is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation."486 U.S. 174, 180 (1988) (citation omitted).

In *North Dakota,* the Supreme Court expounded on the parameters of the doctrine of intergovernmental immunity. *North Dakota,* 495 U.S. at 434-439. The Court held that "[a] state regulation is invalid only if it regulates the United States directly or discriminates against the federal government or those with whom it deals."*Id.* at 435.The Court explained that it had thoroughly rejected the argument that a state regulation that just indirectly regulates the federal government's activity is unconstitutional. *Id.* at 434.Therefore, the Court held, North Dakota regulations that imposed labeling and reporting requirements on out-of-state liquor suppliers to federal military bases did not violate the intergovernmental immunity doctrine. *Id.* at 436.The regulations did not directly regulate the federal government, because they operated against suppliers, not the Government. *Id.* Nor did the regulations discriminate against the federal government, because they actually provided the federal government an avenue to purchase from wholesalers that civilian retailers could not purchase from. *Id.* at 439.

Two federal district court cases provide additional guidance. A federal district court in Minnesota has recently dealt with a similar issue now before this Court. In *United States v. City of St. Paul,* the City of St. Paul attempted to have a house owned by HUD declared a nuisance pursuant to the St. Paul housing code. No. 00-258, slip op. (D.Minn. May 1, 2000). The court granted summary judgment for HUD because St. Paul's claim was barred by both the intergovernmental immunity doctrine and the preemption doctrine. *Id.* With respect to intergovernmental immunity, the court found that St. Paul's housing code interfered and burdened HUD's congressionally mandated duties and thus violated the proscription set out in *M'Culloch v. Maryland,* 17 U.S. 316 (1819).*Id.* at 11.In *Commonwealth of Massachusetts*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa))

*v. Hills,* the court held that because federal law vested in the Secretary of HUD the authority to determine what to do with properties conveyed to HUD, she was not subject to prosecution under the state sanitary code. 437 F.Supp. 351 (D.Mass.1977). The Court finds these cases instructive to the case at hand.

***4** In this case, the City seeks to apply its housing code to HUD property. The City states that the disrepair of the ceilings, floors and walls in the structures are dangerous and that unsecured, vacant buildings pose an attractive nuisance to children and indigents. The City also states that the unsecured structures make rodent habitation probable, and that the rodents could then traverse the neighborhood. For all these reasons, the City claims that the property owned by HUD is in violation of the Municipal Housing Code of the City of Des Moines. In its state court petition, the City wants HUD to "vacate and secure the structures, renovate the structures, or remove the structures." Pet. at 2. This request is not a mere "indirect[ ] regulat[ion]," *North Dakota,* 495 U.S. at 434, or an "incidental" byproduct of local law, *Johnson,* 254 U.S. at 56. Rather the City seeks to "move directly against the activities of the Government" in the use of its property-a situation that runs the greatest risk of undermining the "fundamental command of the Supremacy Clause." *North Dakota,* 495 U.S. at 438 n. 9 (citation omitted). In short, by virtue of the doctrine of intergovernmental immunity, HUD is not subject to the City's local housing codes.

B. Preemption

In addition to intergovernmental immunity, the Court finds that HUD wins on preemption grounds. By virtue of the Supremacy Clause of the United States Constitution, federal law-which "encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization,"*City of New York v. Federal Communications Comm'n,* 486 U.S. 57, 63 (1988)-can preempt state law. In some cases, federal law may expressly preempt state or local law, *see Kinley Corp. v. Iowa Utilities Bd.,* 999 F.2d 354 (8th Cir.1993), or federal law may so "occupy the field" of a given area that state law is deemed preempted, *see Heart of Am. Grain Inspection Serv., Inc. v. Missouri Dep't of Agric.,* 123 F.3d 1098 (8th Cir.1997). Even if, as in this case, Congress has not occupied the field, "state law is naturally preempted to the extent of any conflict with a federal statute, ... [or] where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."*Crosby v. National Foreign Trade Council,*-U.S.-,-, 120 S.Ct. 2288, 2294 (2000) (citations and brackets omitted).

In this case, the local ordinances at issue directly conflict with, and are an obstacle to, a federal statute and its accompanying regulations. In the National Housing Act, 12 U.S.C. §§ 1701-1750, Congress declared a national goal of a "decent home and a suitable living environment for every American family."12 U.S.C. § 1701t. Congress also declared it a goal to assist low-income families with their housing needs. *Id.* HUD explains that as part of carrying out that goal, HUD insures the mortgages on qualifying homes. This means it promises to pay lenders in the event low income home-buyers fail to make payments. When the buyer defaults, HUD pays the lender what is owed and takes title to the property. HUD explains that under the Act, Congress gave HUD broad authority concerning the disposal of the properties acquired in this process. Under 12 U.S.C. § 1710(g), the Secretary is empowered to, among other things, "rent, renovate, modernize, insure, or sell for cash or credit, in his discretion, any properties conveyed to him [and] shall by regulation, carry out a program of sales of such properties and shall develop and implement appropriate credit terms and standards to be used in carrying out the program ...." The terms of the statute empower the Secretary to "sell real and personal property ... on such terms and conditions as the Secretary may prescribe."12 U.S.C. § 1710(g).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 5
Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa)
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa))

**\*5** Pursuant to § 1710(g), the Secretary promulgated regulations which provide that properties acquired by HUD can be offered for sale "as is." 24 C.F.R. § 291.100(c)(3). If HUD wishes to fix up a piece of property, it can do so; it's just not obligated to. Properties that need renovations sell at a discounted price. HUD explains that selling properties quickly ensures the maximum return to the mortgage insurance fund. *See*24 C.F.R. § 203.670 ("It is HUD's policy to reduce the inventory of acquired properties in a manner that expands homeownership opportunities, strengthens neighborhoods and communities, and ensures a maximum return to the mortgage insurance fund.").

Prior to the mid-1970s, HUD had a policy to do exactly what the City is now demanding: refurbish and repair to its existing properties. In a 1991 report, the Assistant Secretary stated that the practice of refurbishment was discontinued for three reasons: (1) expensive repairs that were paid for out of the insurance fund were undone by acts of vandalism; (2) the Agency frequently found itself the victim of fraud by those with whom it contracted to perform renovations; (3) repairs sometimes interfered with the renovation plans of purchasers who preferred to pay less money for property that they could fix themselves. *See*Single Family Property Disposition Program, 56 Fed.Reg. 13996, 13997 (1991).

The National Housing Act and its accompanying regulations demonstrate that federal policies regarding the disposition of federal property, like the one at issue here, are not made subject to local housing codes.[FN2]The National Housing Act gives HUD and its agents wide latitude to dispose of properties as they deem necessary to fulfill their legislative mandate. The City's attempt to apply its housing code to property owned by HUD "stands as an obstacle to the accomplishment and execution,"*Crosby,*-U.S. at-, 120 S.Ct. at 2294, of HUD's Congressionally authorized authority to sell property "as is" and thereby maximize the return to the insurance fund. Forcing HUD to fix up the residence at 1256 E. 25th Street would override the provision of § 291.100(c)(3) which permits HUD to sell that property "as is." Under the Supremacy Clause, that outcome is not possible. *See Hillsborough County,* 471 U.S. at 716 ("[P]resumption that ... local regulation of health and safety matters can constitutionally coexist with federal regulation" can be overcome by showing a "conflict between a particular local provision and the federal scheme"); *City of New York,* 486 U.S. at 63-64 ("[A] federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation and hence render unenforceable state or local laws[.]") (internal quotes and citation omitted); *see also Symens v. Smithkline Beecham Corp.,* 152 F.3d 1050, 1054 (8th Cir.1998).

> FN2. True, the National Housing Act and its accompanying regulations do not expressly oust local law. But given the overall scheme of the statute, the preemptive effect on the local law in this case is still the same. *See Hines v. Davidowitz,* 312 U.S. 52, 68 n. 20 (1941) ("For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must, of course, be considered, and that which needs [to] be implied is of no less force than that which is express.").

The City is correct to point out that there are competing policies at stake here: the City's traditional concern in regulating the health and safety of its neighborhoods versus HUD's policy to administer a residential mortgage insurance program in a cost effective way. The Supreme Court has even identified this tension: "It has long been recognized that many of the responsibilities conferred on federal agencies involve a broad grant of authority to reconcile conflicting policies."*City of New York,* 486 U.S. at 64. The Supreme Court, however, has instructed that when preemption principles are implicated, "if the agency's choice to pre-empt represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa)  
(Cite as: Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa))

Page 6

not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."*Id.* (internal quotes and citation omitted). HUD's "as is" policy reasonably accommodates the overall federal policy of addressing the needs of buyers and lenders in the low-income housing market on the one hand, and local housing regulations on the other. The Court therefore holds that those portions of the City's housing code requiring HUD to vacate, repair, or remove the property in question are preempted by the National Housing Act and its implementing regulations.

### IV. Conclusion

**\*6** For the reasons stated above, HUD's motion to dismiss (Clerk's # 5) is granted.

IT IS SO ORDERED.

S.D.Iowa,2000.  
City of Des Moines v. Secretary of Housing and Urban Development  
Not Reported in F.Supp.2d, 2000 WL 33666936 (S.D.Iowa)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                   Page 1
Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.))

City of Country Club Hills v. U.S. Dept. of Housing and Urban Development
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
    United States District Court, N.D. Illinois, Eastern Division.
CITY OF COUNTRY CLUB HILLS, a municipal corporation, Plaintiff,
v.
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; Golden Feather Realty Services, Inc., Defendants.
**No. 99 C 7139.**

Sept. 17, 2001.

*MEMORANDUM OPINION AND ORDER*

LEINENWEBER, J.
***1** The City of Country Club Hills (the "City") finds the United States Department of Housing and Urban Development ("HUD") to be a neglectful and absentee landlord with respect to its vacant single family homes within the town. The City issued more than 161 citations against HUD properties, claiming that the properties failed to comply with the City building code. HUD removed the case to federal court, counterclaiming that the City's actions violate the Supremacy Clause of the United States Constitution and seeking permanent injunctive relief. The citations were previously dismissed with prejudice, leaving only HUD's counterclaim. HUD's motion for summary judgment on the remaining counterclaim is now before the Court.

*BACKGROUND*

As a preliminary matter, the Court notes that the City failed to provide record support for several statements in its Local Rule 56.1 Statement of Additional Facts. The Court therefore disregards them. *See Brasic v. Heinemann's Inc.,* 121 F.3d 281, 284 (7th Cir.1997) (refusing to consider the plaintiff's additional facts where not supported by specific references to the record). In addition, other paragraphs contained legal argument or conclusions of law that have no place in a statement of facts. L.R. 56.1(b)(3)(B). Accordingly, paragraphs 5, 6, 8, 10-12, 15-17, 20, 21, 26, and 34 are stricken. The material, undisputed facts are summarized below.

As part of its mandate to provide affordable housing to all Americans, HUD insures mortgages on single family homes through the Single Family Mortgage Insurance Program (the "Insurance Program"), set forth in 24 C.F.R. pt. 203 (2001). This insurance is commonly known as FHA insurance. If a mortgagor defaults on a HUD-insured mortgage, the mortgagee may foreclose and convey title of the property to HUD. The mortgagee then submits an insurance claim to HUD for payment of most of the mortgagee's losses, and HUD disposes of the property according to its procedures.

Disposal of such acquired property is governed by the Single Family Property Disposition Program (the "Disposition Program"). *See* 24 C.F.R. pt. 291 (2001). The implementing regulations and HUD Handbook 4310.5 REV-2 (1994) identify the procedures followed in disposing of such property. The Disposition Program's purpose is to reduce the inventory of acquired properties "in a manner that expands home ownership opportunities, strengthens neighborhoods and communities, and ensures a maximum return to the mortgage insurance fund." 24 C.F.R. § 291.1(a)(2) (2001).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                     Page 2
Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.))

Prior to conveying the properties to HUD, the mortgagees are responsible for preserving and protecting them. After conveyance, the properties become the responsibility of HUD's Real Estate Owned Division. HUD does not manage the properties directly, however. Instead, HUD contracts with a so-called M & M contractor which manages and markets the properties while in HUD's inventory. The M & M contractors are responsible for both the preservation and sale of the properties.

**\*2** HUD's M & M contractor for Northern Illinois is Golden Feather Realty Services, Inc. One of Golden Feather's duties is to inspect the properties and eliminate any imminent hazards. Golden Feather must preserve and protect all vacant HUD-owned properties by removing debris, boarding-up the properties, and neutralizing any hazards within a 24-hour period. Nevertheless, HUD regulations provide that the properties are sold on an "as-is" basis, without repairs or warranties. 24 C.F.R. § 291.100(c) (2001).

Country Club Hills is a southwest suburb of Chicago. The City aggressively enforces a property maintenance program, inspecting thousands of homes and taking hundreds of violators to court over the last three years. During 1999, there were between 100 and 200 vacant homes in the City, and it inspected all of these homes during the summer of 1999. The City enforces its building code ordinances against all properties within it, not just those owned by HUD.

The undisputed evidence makes clear that Dwight Welch, the City's mayor, was particularly unhappy with the deteriorating HUD properties within City limits. Welch criticizes HUD for allowing the properties to deteriorate, creating health and safety concerns and negatively affecting neighboring property values. One such HUD property has approximately 12-15 code violations. Despite being issued several citations, the violations have not been corrected. Another purportedly HUD-owned vacant property has holes through which vermin, rain, and snow can pass, and its deck is falling down.

During July and August 1999, Welch launched an offensive designed to draw attention to the HUD properties. He met with his city manager and members of his building inspection department, chastised the staff for allowing several of the vacant homes in town to reach their current state of deterioration, and told them to conduct inspections and issue citations for building code violations. He also expressed his dissatisfaction with HUD's management to a local newspaper, stating that he was "fighting mad" and calling the federal government "the biggest slumlord we have." Welch confirmed to the newspaper that inspectors were told to check all vacant homes in the City by August 14, 1999, and he also promised to present the citations in state court on August 24, 1999. In the article, Welch indicated that HUD's practices resulted in lower property values, and despite his lack of authority to do so, he even threatened to arrest the Secretary of Housing and Urban Development for the code violations if the Secretary ever visited. The City also produced a video entitled "HUD, the Unwanted Neighbor," showing numerous vacant city homes claimed to be owned by HUD.

In August 1999, the City issued 75 citations against the contractor managing the HUD single family properties for alleged violations of the building code (the "August citations"). A state court awarded the City $36,500 in fines which were then recorded as judgment liens on the respective properties. Welch met with HUD officials and warned them that the City would continue to issue mass citations against HUD or its property managers every month. He also threatened that even if HUD properties came into compliance with the City's local ordinances, he would only agree to continuances of the citations in state court.

**\*3** The City also submitted an application on August 24,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.))

1999, to HUD's contractor seeking certification of not-for-profit status from HUD. The not-for-profit status would allow the City to purchase local family homes from HUD at significant discounts and receive HUD-subsidized home-improvement loans. The application included a narrative stating that "low and moderate income families benefit from the City of Country Club Hill program by ... purchasing a home below fair market value." Although a September 30, 1999, newspaper interview indicated that Welch wanted HUD to turn over management of the single family homes to the City, he testified at his deposition that the City did not wish to manage such homes.

On September 27, 1999, the City passed an ordinance requiring that all residential property managers and their subcontractors pay an annual $1,000 licensing fee. The ordinance preamble specifically names the United States Government and HUD as members of the class to be regulated under the ordinance. HUD points out that the ordinance does not likewise single out real estate brokers or firms, although the Court notes that such groups would be included under the broad ordinance definition of "property managers." Since enactment of the ordinance, the City has forced at least one contractor working for Golden Feather to leave a home repair job in the City because it did not have the required license.

From October 18, 1999 through October 21, 1999, City inspectors issued approximately 161 citations against 27 vacant properties purportedly owned by HUD (the "October citations"). Several of the October citations applied to violations previously cited in August. HUD characterizes the alleged violations as "cosmetic" or "cryptic," and lists several examples: "window and door frames need painting," "paint hand rails," "repair mailbox," "place address on house," "exterior maintenance code violation," and "exterior painting violation." Although the City protests that no one could be arrested for violating the City building code, copies of the tickets kept by the City admonished HUD and Golden Feather that failure to pay the penalty could result in the issuance of an arrest warrant.

On November 2, 1999, the U.S. Attorney for the Northern District of Illinois removed the citations to federal court, staying further state court proceedings. The City voluntarily dismissed all of the October 1999 citations, purportedly because all of the cited properties came into compliance with the City's code.

In its defense, the City states that it enforces the building code against all residences, not just HUD properties. The City denies that Welch's statements to the newspapers related to the City's issuance of tickets and indicates that the citations were issued solely because of code violations. The City also claims that it has adopted procedures designed only to obtain code compliance and facilitate HUD's transfer of vacant HUD homes.

**\*4** HUD complains that, as a result of the City's efforts, no HUD properties in the City were sold between July 20, 1999, and December 3, 1999, after the citations had been removed and stayed by the district court. The City avers that it has never held up the sale of a HUD-owned vacant single family home because of code violations and points out that HUD fails to identify any sales actually hindered during that period.

HUD seeks declaratory judgment that the City's efforts violate the Supremacy Clause of the United States Constitution and a permanent injunction prohibiting further City enforcement of its building code against the HUD-held vacant single family homes. The City responds that Congress could not have intended to allow poorly maintained HUD properties to become a blight on the communities in which they are located. Their respective arguments are examined below.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  Page 4
Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.))

*DISCUSSION*

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party. Wolf v. N.W. Ind. Symphony Soc., 250 F.3d 1136, 1141 (7th Cir.2001).

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, Cl. 2. State and local law may run afoul of the Supremacy Clause by one of two ways: (1) the law may conflict with and therefore be preempted by congressional command or (2) the law may directly regulate or discriminate against the federal government in violation of the intergovernmental immunity doctrine. North Dakota v. U.S., 495 U.S. 423, 434 (1990).

HUD contends that the National Housing Act (the "NHA") and subsequent regulations preempt the City's building code. The City responds with several arguments. First, the City asserts that HUD is not authorized to promulgate regulations preempting local building codes. Second, the City maintains that HUD's regulations do not conflict with state law. Third, the City argues that compliance with the building code will not conflict with HUD's federally mandated purposes. Fourth, the City states that HUD offers no proof that compliance with the building code would frustrate its efforts.

Under the Supremacy Clause, Congress may preempt state or local law expressly or implicitly. Crosby v. National Foreign Trade Council, 530 U.S. 363, 371-72 (2000). Congress implicitly preempts state law when Congress intends federal law to "occupy the field," or if Congress has not occupied the field, state law is preempted to the extent of any conflict with a federal statute. *Id.* (citations omitted).

**\*5** As Congress has not expressly preempted state law in this case, the City's building code will be preempted if, "under the circumstances[,] ... the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373 (citations and brackets omitted). Implicit preemption can be effected either directly by Congressional acts or indirectly by federal agencies acting within the scope of their congressionally delegated authority, thereby rendering unenforceable state or local laws that are otherwise consistent with federal law. City of New York v. F.C.C., 486 U.S. 57, 63-64 (1988).

With passage of the NHA, Congress declared its hope to provide "a decent home and a suitable living environment for every American Family." 12 U.S.C. § 1701(t). The NHA provides:

Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, the Secretary shall have power to deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in his discretion, any properties conveyed to him in exchange for debentures and certificates of claim as provided in this section.... The Secretary shall, by regulation, carry out a program of sales of such properties and shall develop and implement appropriate credit terms and standards to be used in carrying out the program.... The Secretary may sell real and personal property acquired by the Secretary pursuant to the provisions of this chapter on such terms and conditions as the Secretary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.))

may prescribe.

12 U.S.C. § 1710(g). Thus, the NHA confers broad discretion to the Secretary when deciding if HUD-held homes should be repaired and the extent of any such repairs. To this end, the Secretary has promulgated regulations setting forth HUD's policy on repairs to homes held under the Single Family Disposition Program.

Prior to the mid-1970's, HUD made extensive repairs to the properties before selling them, but vandalism, contractor fraud, and a desire to allow purchasers to renovate the properties as they wished, convinced HUD to forego such renovations. *Single Family Property Disposition Program,* 56 Fed.Reg. 13997 (1991) (notice of proposed rule to be codified at 24 C.F.R. pt. 291). As a result, HUD adopted its "as-is" policy: in order to return acquired property to the market as quickly as possible, properties are sold on an "as-is" basis, without repairs or warranties. *See* 24 C.F.R. § 291.205; 24 C.F.R. § 291.100(c)(2)-(3).

The "as-is" policy reflects HUD's decision to reduce the number of acquired properties "in a manner that expands home ownership opportunities, strengthens neighborhoods and communities, and ensures a maximum return to the mortgage insurance fund." *HUD Handbook 4310.5 REV-2 (1994).* In adopting the "as-is" policy, HUD explained that the "problems with making repairs are legitimate concerns that outweigh any benefits of completing extensive repairs before sale." *Single Family Property Disposition Program,* 56 Fed.Reg. 46965 (1991) (notice and discussion amending regulations codified at 24 C.F.R. Part 291). HUD asserts that it adopted this policy because it allows properties to be sold more quickly, helping to preserve and stabilize neighborhoods and communities.

**\*6** The NHA confers broad discretionary authority on the Secretary to carry out his duties. This wide latitude extends to HUD's decision to sell the property "as-is," thereby maximizing the return to the insurance fund. The City's publicity campaign regarding HUD's failure to maintain the properties and its citations for code violations impermissibly frustrate HUD's policy of returning the properties to the market as quickly and cheaply as possible. Forcing HUD to make repairs removes the discretion clearly vested in the Secretary by the NHA. The choice forced upon HUD to either make the repairs or incur further citations that will result in judgment liens on the properties interferes with HUD's goals by imposing unwarranted costs to HUD and potential buyers. Although it is unclear whether the October citations and negative publicity generated by the City actually affected sales, it can be assumed that continued action by the City will negatively affect future sales. The increased costs imposed on HUD by further enforcement of the City's building code cannot continue to "stand[ ] as an obstacle to the accomplishment and execution" of HUD's policies. *Crosby,* 530 U.S. at 373.

The City complains that allowing HUD to ignore the building code will depress property values and blight the community with ramshackle homes. Indeed, HUD's policies for administering a residential mortgage insurance program in a cost-effective way and the City's legitimate concern in regulating the health and safety of its neighborhoods create an unfortunate tension between local and federal interests. Nevertheless, an "agency may determine that its authority is exclusive and preempt[ ] any state efforts to regulate in the forbidden area." *City of New York v. F.C.C.,* 486 U.S. 57, 64 (1988). "[I]f the agency's choice to pre-empt represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id* . In this case, the court cannot say that HUD's "as-is" policy does not reasonably accommodate the overall federal policy of addressing the needs of buyers and lenders in the low-income housing market. Accordingly, those portions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 6
Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.))

of the City's housing code requiring HUD to vacate, repair, or remove the property in question are preempted by the NHA and its implementing regulations.

The City's actions also violate principles regarding the boundaries between state and federal power as set forth long ago in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316 (1819). "[T]he states have no power ... to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is ... the unavoidable consequence of that supremacy which the constitution has declared." *Id.* at 436.

**\*7** The City's building code as applied to HUD and its properties impedes, burdens, and interferes with the operation of constitutional federal law. The impact is not incidental; as detailed above, it is impermissibly intrusive as to HUD. The Court finds unconvincing the City's argument that it is not directly regulating the federal government by virtue of the fact that it is issuing citations to HUD's M & M contractor. The City is attempting to regulate the property itself, the owner of which is HUD. It is immaterial whether the City cites HUD or its agent when attempting to impose its will; the effect is the same in either case. Such a burden cannot be imposed upon a federal agency attempting to execute a function of government. *See Mayo v. United States,* 319 U.S. 411, 447 (1943). Two recent cases support this conclusion. In *United States v. City of St. Paul,* 258 F.3d 750 (8th Cir.2001), the court refused to allow St. Paul to enforce its nuisance code against HUD properties acquired under the Insurance Program (noting that "HUD must be allowed to carry out its federal functions in a relatively uniform fashion. [It] cannot be subjected to a vast multitude of municipal ordinances throughout the United States...."). The court in *City of Des Moines v. Secretary of Housing and Urban Development,* No. 4-99-CV-90625 (S.D.Iowa Sept. 22, 2000) similarly held that the Supremacy Clause prohibits Des Moines from forcing HUD to abide by its housing code for HUD properties acquired under the Insurance Program.

*CONCLUSION*

For the foregoing reasons, HUD's Motion for Summary Judgment is granted. The City's enforcement of its building ordinances against HUD and its contract property manager is barred by the Supremacy Clause. The City is therefore permanently enjoined from seeking to cite, fine, or penalize HUD or its employees, agents, or contractors, when they are carrying out their duties derived from the National Housing Act and all regulations promulgated thereunder or taking any other action inconsistent with this Order.

IT IS SO ORDERED.

N.D.Ill.,2001.
City of Country Club Hills v. U.S. Dept. of Housing and Urban Development
Not Reported in F.Supp.2d, 2001 WL 1117276 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.